UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

THERESA MARIE HECK,

        Plaintiff,

    v.                             Case No. 19-C-73

ROXANNE O. ROESE,

        Defendant.

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Theresa Marie Heck, who was serving a state prison sentence at Robert E. Ellsworth Correctional Center at the time of filing and representing herself, filed this action pursuant to 42 U.S.C. § 1983, alleging that Defendant Nurse Practitioner Roxanne Roese was deliberately indifferent to her medical needs. This matter comes before the court on Defendant's motion for summary judgment. Defendant asserts that Plaintiff failed to exhaust her administrative remedies as required by the Prison Litigation Reform Act (PLRA) and has failed to establish that Defendant violated the Eighth Amendment. For the following reasons, the motion will be granted and the case will be dismissed.

### BACKGROUND[1]

Plaintiff was an inmate in the custody of the Wisconsin Department of Corrections (DOC) and housed at Robert E. Ellsworth Correctional Center (REECC) at all times relevant to this action.

---

[1] Plaintiff failed to respond to Defendant's proposed findings of fact in accordance with Civil L.R. 56. As a result, those facts are deemed admitted for the purposes of summary judgment. *See* Civil L.R. 56(b)(4); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission.").

Plaintiff was released from DOC custody on December 31, 2019. Defendant has been licensed as a Nurse Practitioner in the State of Wisconsin since 1998. She was employed by the State of Wisconsin since November 1999 and was a Nurse Practitioner at REECC beginning in May 2010 until her retirement on June 28, 2019.

Plaintiff has a history of complaints of chronic pain, especially in her neck, knees, and hips/groin. She has been diagnosed with Restless Leg Syndrome, mild to moderate degenerative changes of the right hip, mild degenerative joint disease in the left hip, bilateral groin and thigh pain, and chondromalacia in her knees. Defendant was assigned as Plaintiff's Advanced Care Provider (ACP) while Plaintiff was incarcerated at REECC, was responsible for overseeing Plaintiff's plan of care, and had authority to make executive decisions about Plaintiff's care based on her expertise, training, and experience.

On October 6, 2017, Plaintiff was seen by Dr. Goran Jankovic at Wheaton Franciscan Healthcare – All Saints for complaints of bilateral hip and knee pain. Dr. Jankovic ordered a fluoroscopically guided injection for Plaintiff's right hip, x-rays of both knees, and an x-ray of Plaintiff's left hip. Plaintiff underwent an initial evaluation for physical therapy to treat her chronic knee pain on October 16, 2017. The physical therapist, Mike Koscielak, noted weakness in her quadriceps, and Plaintiff complained about bilateral hip pain. On October 18, 2017, Plaintiff received a fluoroscopically guided steroid injection in her right hip. There was no order for an injection in her left hip. Plaintiff received physical therapy between October 23 and November 27, 2017, for her chronic knee pain and quad weakness. She reported that she was intermittently doing her home exercises. Koscielak noted that Plaintiff had injections done in her hip the week prior, and Plaintiff reported that she believed the injections did not help. Plaintiff's physical therapy was discontinued after her four prescribed sessions with no significant progress made.

2

On December 18, 2017, Plaintiff submitted a Health Service Request (HSR) requesting a lower bunk restriction. Plaintiff was subsequently scheduled for an appointment with Defendant for evaluation. On January 10, 2018, Plaintiff was seen in the Health Services Unit (HSU) by Nurse Muto after a bookshelf fell on her in the library. There were no scratches or bruises noted, and Plaintiff was able to move all extremities well. Plaintiff was given a cold compress, a cane, a two-week low bunk restriction, and a one-day elevator pass. On January 29, 2018, Nurse Muto saw Plaintiff for complaints of right hip pain. Plaintiff stated that her hip popped the day before when she slid on the ice. Nurse Muto noted full range of motion, no complaints of pain, and that Plaintiff appeared very stable. Nurse Muto also noted, "Upon further talking, she said a low bunk would make it all better." Plaintiff was told that her request would be looked into, and Plaintiff ambulated out of HSU without difficulty.

On February 1, 2018, Defendant sent a memo to Plaintiff explaining that she would no longer be on a low bunk restriction because she was able to stand and move effortlessly. Plaintiff had been observed pushing another inmate in a wheelchair without issue, and she was able to demonstrate getting in and out of a bunk on January 29, 2018 without issue. Defendant also explained that Plaintiff did not need to see the orthopedist as she had an appointment with Defendant two weeks prior.

Plaintiff sent HSRs on February 3, 2018, and March 8, 2018, complaining about the orthopedics appointment being cancelled. A nurse responded to the February HSR stating that this was a decision made by her ACP and that Defendant had explained the reason for the cancelation in the memo. A nurse responded to the March HSR asking if Plaintiff wanted to be seen on a sick call.

On March 13, 2018, Plaintiff submitted an HSR requesting to be seen on sick call by a doctor regarding her arthritis. A nurse responded to the HSR and informed Plaintiff that her hips

3

had already been addressed by Defendant and that she would be placed on Defendant's list to be seen about her neck issues. Plaintiff began physical therapy for her neck on March 16, 2018. Over the course of her treatment, Koscielak noticed issues with Plaintiff's groin, suggested that she may have a labrum tear, and recommended Plaintiff see an orthopedist about a possible left labrum tear. Plaintiff's physical therapy sessions continued until April 27, 2018.

Defendant saw Plaintiff on April 6, 2018 for her complaints of neck pain. Defendant noted that Plaintiff had poor posture, and that she could not demonstrate back to Defendant her exercises from physical therapy. Defendant recommended that she continue physical therapy, NSAIDs, a topical anti-inflammatory gel, and ice/heat as needed. Defendant also instructed Plaintiff to practice proper body mechanics and avoid pivoting or pushing a wheelchair with a heavy inmate.

On May 17, 2018, Dr. Jankovic saw Plaintiff to evaluate her bilateral hip pain and possible labrum tear. Dr. Jankovic noted that there was no labrum tear and that Plaintiff had previously received injections in her right hip, which Plaintiff reported gave her relief. Plaintiff expressed that she would like to try injections again, so Dr. Jankovic ordered a set of injections. Dr. Jankovic cautioned Plaintiff that repetitive injections in the hip could lead to problems and other issues down the road. He also noted that Plaintiff had some mild arthritis and advised that it is something she is likely going to have to deal with. He recommended one more injection, then stated the prison staff would be able to manage her pain. Dr. Jankovic noted he would not recommend more than one injection per hip per year.

On May 18, 2018, Defendant reviewed Dr. Jankovic's report and wrote a memo to Plaintiff informing her that, based on Dr. Jankovic's written report, he was requesting hip injections yearly. Defendant determined that it would be best to try other interventions for as long as possible, as she was concerned that the overuse of steroid injections could weaken Plaintiff's bones. Plaintiff submitted an HSR on May 20, 2018, stating that she understood the risk of injections but wanted

4

to pursue them anyways. Defendant reviewed the HSR and responded to it on May 24, 2018, informing Plaintiff that she ordered injections with Dr. Jankovic in June. On June 13, 2018, Defendant learned that Dr. Jankovic was no longer going to treat inmates. Defendant sent a memo to Plaintiff informing her that Dr. Jankovic had decided to no longer provide care for inmates, that he did not advise hip injections at that time, and that she would be seeing a new doctor in the future. Defendant administered bilateral bursa cortisone injections into Plaintiff's hips for her complaints of pain in the bursa sac area on July 20, 2018, and August 10, 2018. These injections were done for probable bilateral hip bursitis and the injection was in a different area than the fluoroscopic steroid injections completed by Dr. Jankovic.

On September 12, 2018, Defendant requested that an appointment be made for Plaintiff to be evaluated for cortisone injections in her bilateral groin. Plaintiff submitted an HSR on October 6, 2018, complaining that she experienced an increase in pain in her right hip and groin and left side and experienced buckling. She asked if someone had been found for her injections. On October 8, 2018, Nurse Davis saw Plaintiff in response to the HSR. At the appointment, Plaintiff reported that she experienced a pain at 4-5/10 while lying down, the pain was 10/10 when her hip buckles, and her current pain was 2/10. Nurse Davis told Plaintiff that she was scheduled for an appointment and should continue to take her medication as ordered.

Dr. Ross at Wheaton Franciscan Healthcare Orthopedics saw Plaintiff on October 10, 2018. Dr. Ross recommended injections in both hips. Plaintiff went to the WFH Emergency Department on October 19, 2018, after she fell going to the bathroom. The emergency department staff gave her ibuprofen and lidocaine and recommended that she see Dr. Ross in orthopedics as soon as possible. Plaintiff was seen later that day by Nurse Baratta and Defendant. Plaintiff claimed her left hip gave out and she fell to both her knees and left elbow. Defendant ordered lidocaine cream and ibuprofen, and Plaintiff was instructed on their use.

5

On November 9, 2018, Plaintiff was sent off-site to receive cortisone injections in her hips. Dr. Ross noted that the appointment needed to be made with the radiology department and the injections were not able to be performed that day. On November 19, 2018, Nurse Muto saw Plaintiff for her complaints of bilateral hip pain. Plaintiff reported her pain as a 2/10 while sitting and a 4/10 while laying down and noted that she wanted to continue working. Plaintiff was using ibuprofen, dry heat, and a topical cream. Nurse Muto recommended using a moist heat, muscle rub, and Tylenol, and practicing proper positioning while awaiting injections. On November 28, 2018, Plaintiff received fluoroscopically guided steroid injections in her right and left hip. The doctor noted that Plaintiff tolerated the procedure well and there were no immediate complications.

On December 18, 2018, Plaintiff submitted an HSR requesting to be seen by Dr. Ross, as her pain had returned. She was seen the next day by Nurse Baratta and complained that her pain continued in her hips and groin. She was advised that she should alternate Tylenol and ibuprofen for her pain, per nursing protocol, and that an appointment with Defendant was requested. Defendant saw Plaintiff for multiple issues with musculoskeletal pain on February 1, 2019. Defendant noted that Plaintiff had previously gotten hip injections, which only helped certain areas. Plaintiff expressed concern that she had labrum inflammation. Defendant ordered an appointment with physical therapy to refresh Plaintiff's memory on exercises for her hips, legs, and knees, as she was unable to demonstrate any of the stretches or exercises that she had been taught. Defendant also ordered that Plaintiff get a new pair of shoes with arch supports to help with foot, knee, and hip pain. On February 7, 2019, Defendant ordered physical therapy for Plaintiff's hips after Plaintiff submitted an HSR complaining that she had switched out her shoes but her hips were getting worse. Defendant offered a new anti-inflammatory drug for Plaintiff to try and informed Plaintiff that she should not judge her new shoes until she has had time to adjust and that her arch supports would arrive soon.

6

Koscielak saw Plaintiff on March 8, 2019, for a one-time physical therapy appointment to refresh her memory on previous exercises. Koscielak noted that Plaintiff had demonstrated poor compliance with exercise routines previously instructed. Plaintiff had been given a home exercise plan during her previous episode of care for her knees. He provided Plaintiff with a new exercise program to continue.

On March 17, 2019, Plaintiff submitted an HSR in which she complained about continued hip and groin issues and that her left side was causing her pain. Defendant reviewed the HSR and recommended that Plaintiff continue physical therapy. Defendant advised staff to inform Plaintiff to continue her current medications, hot/cold treatments, and topical analgesics. Plaintiff submitted another HSR on March 28, 2019, complaining about her pain and requesting more testing and x-rays. A nurse responded to the HSR, marking that Plaintiff would be seen on a nursing sick call and that she should be scheduled for an appointment with Defendant. Dr. Miloslavic saw Plaintiff for complaints of bilateral hip pain on April 23, 2019. Dr. Miloslavic noted that Plaintiff had been seen by a physical therapist and had steroid injections in the past, with little improvement. He planned to refer Plaintiff to a comprehensive orthopedist. On April 25, 2019, Defendant saw Plaintiff for a cut on her finger. They spoke briefly about Plaintiff seeing Comprehensive Ortho as ordered, and Defendant offered Plaintiff a different NSAID, Sulindac, to try as an alternative to the other NSAIDs she had trialed. Plaintiff agreed to this trial and to have a follow-up with Defendant later.

On June 6, 2019, Defendant was leaving REECC and witnessed Plaintiff with several other inmates walking down the stairs to the basement entry door. Plaintiff was walking without a limp and without holding the handrail, and she was turning and twisting her body while talking with the other inmates. Defendant did not observe that Plaintiff was in any physical pain or walking with any abnormal gait. This incident reminded Defendant of another incident on approximately April

7

19, 2019, in which Defendant was leaving the kitchen/dining area and noted Plaintiff walking with a normal stride, no limp, and no facial appearance of discomfort. Defendant forgot to document this observation at that time, but she remembered that it reminded her to follow up with Plaintiff about her shoe inserts.

On June 14, 2019, Defendant saw Plaintiff for a medication follow-up for Sulindac. Defendant noted that Plaintiff had a mild limp and a poor sitting posture with her shoulders rolled forward, and that she stepped up and down from the exam table without physical issues. Defendant also noted that Plaintiff would be sent to ortho soon for probable hip injections. On June 18, 2019, Plaintiff submitted an HSR requesting a thicker mattress due to her hip issues. Defendant responded the next day by reminding Plaintiff to review the guidelines for mattress requests and informing her that Defendant ordered a TENS unit that her physical therapist would review with her to determine if it would help. Defendant also took this opportunity to remind Plaintiff that she was on a schedule for once yearly cortisone injections as advised by Dr. Jankovic for her mild degenerative joint disease and that Defendant requested an appointment with ortho to determine if Plaintiff needed new x-rays or imaging. She stated they would move forward from that point. On June 20, 2019, Dr. Werbie at Comprehensive Orthopedics, S.C. saw Plaintiff for her complaints of bilateral hip pain. Dr. Werbie noted that Plaintiff had osteoarthritis of both hips, right greater than left, and a weakness of the quads. He further noted that Plaintiff reported to him that she had previously received cortisone injections and they were helping her. He recommended physical therapy. Defendant retired on June 28, 2019.

Plaintiff filed three inmate complaints that are related to the relevant claims in this lawsuit: RECC-2018-2735, RECC-2018-3967, and RECC-2018-23552. On January 18, 2018, the Inmate Complaint Examiner (ICE) received inmate complaint RECC-2018-2735 from Plaintiff, in which she complains that HSU dismissed her low-bunk restriction. The ICE recommended on February

8, 2018, that Plaintiff's complaint be dismissed on the grounds that Plaintiff's ACP determined that a lower bunk is not medically necessary. On February 9, 2018, the Reviewing Authority dismissed Plaintiff's complaint. On February 22, 2018, the Corrections Complaint Examiner (CCE) acknowledged Plaintiff's appeal, and on February 27, 2018, the CCE recommended that Plaintiff's appeal be dismissed on the grounds that the need for a medical restriction to a lower bunk is the decision of the health care provider and is a matter of professional judgment. The Office of the Secretary dismissed Plaintiff's appeal on March 13, 2018.

On February 12, 2018, Plaintiff filed inmate complaint RECC-2018-3967, complaining that HSU denied and cancelled medical appointments with her orthopedic doctor. The ICE recommended dismissal of Plaintiff's complaint on February 22, 2018, on the grounds that Plaintiff was being seen by HSU for medical appointments as well as patient-initiated requests, which indicated that HSU was attempting to treat Plaintiff for medical issues as they arose. The Reviewing Authority dismissed Plaintiff's complaint on February 26, 2018. Plaintiff did not file an appeal.

On November 11, 2018, Plaintiff filed inmate complaint RECC-2018-23552, complaining that HSU denied and cancelled medical appointments with her orthopedic doctor. The ICE rejected the complaint on December 12, 2018, on the grounds that the issue was previously addressed by the Inmate Complaint Review System. Plaintiff did not file an appeal with respect to this complaint.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences that favor them in the light most favorable to the non-moving

9

party.  *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)).  The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial."  *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted).  "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts."  *Id.*  Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

### A.  Failure to Exhaust Administrative Remedies

As an initial matter, Defendant asserts that this case should be dismissed because Plaintiff failed to exhaust her administrative remedies.  The PLRA provides that an inmate cannot assert a cause of action under federal law "until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(1); *see also Woodford v. Ngo*, 548 U.S. 81, 93 (2006) (holding that the PLRA requires proper exhaustion of administrative remedies).  Exhaustion requires that an inmate comply with the rules applicable to the grievance process at the inmate's institution.  *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002).  A plaintiff's failure to properly exhaust each step of the process constitutes a failure to exhaust available administrative remedies.  *Id.*  The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 526, 532 (2002).  The purpose of § 1997e(a) is to "permit the prison's administrative process to run its course before litigation begins."  *Dole v. Chandler*, 438

F.3d 804, 809 (7th Cir. 2006) (quoting *Cannon v. Washington*, 418 F.3d 714, 719 (7th Cir. 2005)); *see also Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

Wisconsin has implemented the Inmate Complaint Review System (ICRS) under which inmate grievances concerning prison conditions or the actions of prison officials are "expeditiously raised, investigated, and decided." Wis. Admin. Code § DOC 310.01. Under the ICRS, an inmate must file a complaint with the institutional complaint examiner (ICE) within 14 calendar days after the events giving rise to the complaint occur, unless good cause exists to excuse a delay. *Id.* § DOC 310.07(2). The ICE has the authority to return, investigate, or reject the complaint. *Id.* § DOC 310.10. The inmate may appeal the rejection of the complaint to the appropriate reviewing authority within 10 calendar days. *Id.* § DOC 310.10(10). The reviewing authority shall make a decision within 15 days following receipt of the recommendation or appeal of a rejected complaint. *Id.* § DOC 310.11(1). The reviewing authority's decision is final. An inmate may appeal the reviewing authority's decision within 14 days after the date of the decision by filing a typed or legibly printed request for review with the corrections complaint examiner (CCE). *Id.* § DOC 310.12(1). After reviewing an appeal, the CCE recommends a decision to the DOC Secretary, who adopts or rejects the recommendation. *Id.* §§ DOC 310.12; DOC 310.13. The failure to properly exhaust each step of the grievance process before filing a lawsuit constitutes a failure to exhaust administrative remedies. *Pozo*, 286 F.3d at 1025.

Defendant asserts that Plaintiff only exhausted her administrative remedies regarding her complaint that Defendant denied her a low-bunk restriction in early 2018 and failed to exhaust her available administrative remedies with respect to her remaining claims because she did not pursue each step within the administrative process before filing her lawsuit. More specifically, although Plaintiff filed inmate complaints potentially related to her claims that Defendant failed to schedule outside appointments and delayed cortisone injections, she never appealed the Reviewing

11

Authority's decision dismissing her complaints to the CCE. There is no dispute that Plaintiff failed to completely exhaust the administrative process for all of her claims before filing her lawsuit.

Notwithstanding Plaintiff's failure to exhaust her administrative remedies before filing the instant action, the court may set aside the issue of pre-suit exhaustion and consider the merits under certain circumstances. *See Fluker v. Cty. of Kankakee*, 741 F.3d 787, 792–93 (7th Cir. 2013) (although a district court must consider exhaustion before reaching the merits, "nothing . . . prohibits a district court's progression from the PLRA defense to the merits if the situation properly calls for it"). The Seventh Circuit has recognized that, if discovery is closed, a defendant's motion for summary judgment is fully briefed on the merits, and the plaintiff has been afforded a full and fair opportunity to respond, considerations of judicial economy and finality may militate in favor of reaching the merits in the alternative despite the failure to exhaust. *Id.* It makes "perfect sense" to address the merits of the case, here. *Id.* at 793. The court now turns to the merits.

**B. Plaintiff's Deliberate Indifference Claims**

Plaintiff claims Defendant was deliberately indifferent when she delayed Plaintiff's cortisone injections and denied Plaintiff a low bunk restriction. The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. It imposes a duty on prison officials to take reasonable measures to guarantee an inmate's safety and to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A prison official's "deliberate indifference" to a prisoner's medical needs or to a substantial risk of serious harm violates the Eighth Amendment. *Id.* at 828; *see also Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). This does not mean, however, that every claim by a prisoner that she has not received adequate medical treatment states a violation of the Eighth Amendment. To prove a claim of deliberate indifference, the plaintiff must "establish that [she] suffered from 'an objectively serious medical condition' and that the 'defendant was deliberately indifferent to that condition.'" *Wilson*

12

*v. Adams*, 901 F.3d 816, 820 (7th Cir. 2018) (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016)).

Defendant asserts that Plaintiff has not shown that she was deliberately indifferent to an objectively serious medical condition. Deliberate indifference requires more than negligence or even gross negligence; it requires that the defendant knew of, yet disregarded, an excessive risk to the plaintiff's safety. *Farmer*, 511 U.S. at 825, 837; *see also Estelle*, 429 U.S. at 104. It is not enough to show that prison officials merely failed to act reasonably. *Gibbs v. Franklin*, 49 F.3d 1206, 1208 (7th Cir. 1995). "[D]eliberate indifference may be inferred based upon a medical professional's erroneous treatment only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996).

In this case, Plaintiff has not established that Defendant was deliberately indifferent to her medical needs. Defendant's responses to Plaintiff's medical requests and concerns were appropriate given the nature of her complaints and the level of frequent and ongoing care she received. Defendant limited Plaintiff's cortisone injections to once a year, based on the recommendation of Plaintiff's outside providers, and provided alternative treatments for Plaintiff's pain, including medications, physical therapy, ice and heat packs, specialized footwear, a TENS unit, and referrals to at least three outside providers. Although Plaintiff may have disagreed with the type of treatment she received, mere disagreement with Defendant's course of treatment does not amount to deliberate indifference under the Eighth Amendment. *See Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996); *see also Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[Plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her.").

13

In addition, any delays Plaintiff experienced before receiving cortisone injections were not due to Defendant's deliberate indifference but the unavailability of outside providers. Defendant scheduled Plaintiff for injections with Dr. Jankovic but later learned that he was no longer treating inmates. After Dr. Jankovic cancelled Plaintiff's appointment, Defendant referred Plaintiff to Dr. Ross. Dr. Ross ordered injections and Plaintiff subsequently received them. The record shows that Defendant went to great efforts to treat Plaintiff's complaints and concerns of hip pain. Plaintiff has not presented any medical evidence that any delay detrimentally affected, unnecessarily prolonged, or exacerbated her symptoms and caused harm. *See Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007) ("In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm." (citing cases)). That is, Plaintiff has not provided "medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." *Id.* In short, Defendant's actions with respect to Plaintiff's receipt of injections do not constitute deliberate indifference.

Plaintiff also asserts that Defendant was deliberately indifferent for denying Plaintiff a low bunk restriction. Plaintiff received a two-week lower bunk restriction on January 10, 2018, after reporting that a bookshelf fell on her in the library. On February 1, 2018, Defendant sent Plaintiff a memo explaining that Plaintiff would no longer be on a low bunk restriction because she was able to stand and move effortlessly, had been observed pushing another inmate in a wheelchair without issue, and was able to demonstrate getting in and out of a bunk on January 29 without issue. In making this decision, Defendant relied on the January 10 and January 29 objective medical findings of Nurse Muto. Based on her medical judgment, Defendant concluded that Plaintiff no longer needed a low bunk restriction. The Eighth Amendment does not require that medical staff comply with the treatment preferences of a prisoner, and a "medical professional's

14

treatment decisions will be accorded deference 'unless "no minimally competent professional would have so responded under those circumstances."'" *Jackson v. Kotter*, 541 F.3d 688, 698 (7th Cir. 2008) (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)). Plaintiff has not demonstrated that Defendant's medical decisions were a substantial departure from accepted professional judgment. *See Estate of Cole by Pardue*, 94 F.3d at 261–62. Plaintiff has failed to establish that Defendant was deliberately indifferent to her medical needs. Accordingly, the court will grant Defendant's motion for summary judgment.

## CONCLUSION

For these reasons, Defendant's motion for summary judgment (Dkt. No. 34) is **GRANTED**. The Clerk is directed to enter judgment dismissing this case with prejudice.

**SO ORDERED** at Green Bay, Wisconsin this 29th day of April, 2020.

s/ William C. Griesbach
William C. Griesbach, District Judge
United States District Court